UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| IN RE:  PRE-FILLED  PROPANE TANK MARKETING AND SALES PRACTICES LITIGATION<br><br>THIS PLEADING RELATES TO:<br><br>ALL CASES | MDL Docket No. 2086<br><br>Master Case No. 4:09-cv-00465 |

## CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Daniel Bradley, Gina Calarco, Dennis Carroll, Michael D'Aloia, Suzanna De Night, David Desaire, J. Allen Downs, Bart Fraenkel, Jack Fuller, Ed Jaeggi, Jacob Knopke, Tom Miller, Gina Penissi, Carson Ross, Daniel Scholtec, Mark Shawl, Victoria Shawl, Randy Shillingburg, Jeff Walker, Roy Wilder, and Larry Young, on behalf of themselves and all others similarly situated, allege as follows:

### Nature of Action

1.    Plaintiffs bring this class action individually and on behalf of all others similarly situated arising from the unlawful practices implemented by the leader in the retail pre-filled propane gas tank purchase and exchange industry, Ferrellgas, Inc., Ferrellgas, L.P., and Ferrellgas Partners, L.P., which do business with Plaintiffs and Class members under the trademarked name Blue Rhino (collectively, "Defendants" or "Blue Rhino").[1]

---

[1] Plaintiffs reserve the right to amend this Complaint to include AmeriGas (defined in ¶ 32 below) in the event that the Settlement currently before the Court does not become final.

2.     Blue Rhino is a national provider of branded pre-filled propane gas tanks ("Propane Tanks") available for purchase or exchange, and distributed through retail partners located across the country such as Lowe's, Wal-Mart, and Walgreens, as well as various local grocery stores, convenience stores, and gas stations.  Tens of thousands of consumers in the United States purchase Blue Rhino's Propane Tanks, at more than 43,000 locations nationwide.  "Propane Tank(s)" as used in this complaint refers to a 20 pound pre-filled propane tank or cylinder sold at tank exchanges and widely used by American consumers for barbeque grills, outdoor heaters, and other ordinary household usages.

3.     Beginning in or about 2000, Blue Rhino sold and marketed its Propane Tanks as full, though it was filling the tanks with approximately 17 pounds of propane. Beginning in July 2008, with the price of propane increasing, Blue Rhino continued to sell and market the Propane Tanks as full, even though it had surreptitiously reduced the fill of the Propane Tanks to approximately 15 pounds.  In reducing the propane from 17 to 15 pounds, Blue Rhino did not reduce the price of the Propane Tanks, nor did it plainly or adequately disclose the material fact that it reduced the amount of propane in its Propane Tanks.  In other words, in July 2008, Blue Rhino stopped selling Propane Tanks filled with at least 17 pounds of propane, and instead began selling, for the same price, tanks filled with only 15 pounds of propane.  By implementing a scheme to short-change its customers, Blue Rhino was able to effectuate a *de facto* price increase and thus maintain or increase its sales volume and revenues without disclosing that it was raising its prices.

4.     In deciding to under-fill its Propane Tanks, Blue Rhino acted in concert with one or more of its direct competitors, including the other major pre-filled propane tank purchase and exchange player, AmeriGas, furtively creating an industry standard of under-filled tanks that effectively and artificially increased the price charged to consumers of Propane Tanks. Blue Rhino thus entered into an agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, maintain, and stabilize prices for Propane Tanks in the United States and in the various States.

5.     Plaintiffs bring claims for (1) injunctive relief under Section 1 of the Sherman Act (Count I); (2) violations of state antitrust statutes (Count II); (3) violation of state consumer protection statutes (Count III); and (4) unjust enrichment (Count IV).

## Jurisdiction and Venue

6.     Jurisdiction of this Court is based upon 28 U.S.C. §§ 1331, 1332(d)(2), and 1337(a), and 15 U.S.C. §§ 22 and 26. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

7.     This Court also has subject matter jurisdiction over this case under 28 U.S.C. § 1332(d)(2)(A) because the case is brought as a class action between citizens of different states and the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) pursuant to the October 6, 2009 Order of the United States Judicial Panel on Multidistrict Litigation transferring multiple actions to this District for coordinated or consolidated pretrial proceedings.

9.     Venue in this District is also proper under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) and (c) because Blue Rhino conducts business in this District and the unlawful conduct giving rise to the claims occurred, in part, in this District.

## Parties and Non-Parties Identified in the Complaint

10.     Plaintiff Jack Fuller is a citizen of California.  During the class period Plaintiff purchased pre-filled Blue Rhino Propane Tanks from one or more retailers within California.  For each purchase, he understood that he was paying for a full tank and was deceived when he received less than a full tank.  Plaintiff Jack Fuller was damaged by Blue Rhino's illegal conduct described herein.

11.     Plaintiff Roy Wilder is a citizen of California.  During the class period Plaintiff purchased pre-filled Blue Rhino Propane Tanks from one or more retailers within California.  For each purchase, he understood that he was paying for a full tank and was deceived when he received less than a full tank.  Plaintiff Roy Wilder was damaged by Blue Rhino's illegal conduct described herein.

12.     Plaintiff Michael D'Aloia is a citizen of Florida.  During the class period Plaintiff purchased pre-filled Blue Rhino Propane Tanks from one or more retailers within Florida.  For each purchase, he understood that he was paying for a full tank and was deceived when he received less than a full tank.  Plaintiff Michael D'Aloia was damaged by Blue Rhino's illegal conduct described herein.

13.     Plaintiff Carson Ross is a citizen of Florida.  During the class period Plaintiff purchased pre-filled Blue Rhino Propane Tanks from one or more retailers within Florida.  For each purchase, he understood that he was paying for a full tank and

was deceived when he received less than a full tank. Plaintiff Carson Ross was damaged by Blue Rhino's illegal conduct described herein.

14. Plaintiff Dennis Carroll is a citizen of Illinois. During the class period Plaintiff purchased pre-filled Blue Rhino Propane Tanks from one or more retailers within Illinois. For each purchase, he understood that he was paying for a full tank and was deceived when he received less than a full tank. Plaintiff Dennis Carroll was damaged by Blue Rhino's illegal conduct described herein.

15. Plaintiff Larry Young is a citizen of Illinois. During the class period Plaintiff purchased pre-filled Blue Rhino Propane Tanks from one or more retailers within Illinois. For each purchase, he understood that he was paying for a full tank and was deceived when he received less than a full tank. Plaintiff Larry Young was damaged by Blue Rhino's illegal conduct described herein.

16. Plaintiff Tom Miller is a citizen of Iowa. During the class period Plaintiff purchased pre-filled Blue Rhino Propane Tanks from one or more retailers within Iowa. For each purchase, he understood that he was paying for a full tank and was deceived when he received less than a full tank. Plaintiff Tom Miller was damaged by Blue Rhino's illegal conduct described herein.

17. Plaintiff David Desaire is a citizen of Kansas. During the class period Plaintiff purchased pre-filled Blue Rhino Propane Tanks from one or more retailers within Kansas. For each purchase, he understood that he was paying for a full tank and was deceived when he received less than a full tank. Plaintiff David Desaire was damaged by Blue Rhino's illegal conduct described herein.

18.     Plaintiff J. Allen Downs is a citizen of Kansas.  During the class period Plaintiff purchased pre-filled Blue Rhino Propane Tanks from one or more retailers within Kansas.  For each purchase, he understood that he was paying for a full tank and was deceived when he received less than a full tank.  Plaintiff J. Allen Downs was damaged by Blue Rhino's illegal conduct described herein.

19.     Plaintiff Daniel Scholtec is a citizen of Minnesota.  During the class period Plaintiff purchased pre-filled Blue Rhino Propane Tanks from one or more retailers within Minnesota.  For each purchase, he understood that he was paying for a full tank and was deceived when he received less than a full tank.  Plaintiff Daniel Scholtec was damaged by Blue Rhino's illegal conduct described herein.

20.     Plaintiff Gina Calarco is a citizen of Missouri.  During the class period Plaintiff purchased pre-filled Blue Rhino Propane Tanks from one or more retailers within Missouri.  For each purchase, she understood that she was paying for a full tank and was deceived when she received less than a full tank.  Plaintiff Gina Calarco was damaged by Blue Rhino's illegal conduct described herein.

21.     Plaintiff Jacob Knopke is a citizen of Missouri.  During the class period Plaintiff purchased pre-filled Blue Rhino Propane Tanks from one or more retailers within Missouri.  For each purchase, he understood that he was paying for a full tank and was deceived when he received less than a full tank.  Plaintiff Jacob Knopke was damaged by Blue Rhino's illegal conduct described herein.

22.     Plaintiff Suzanna De Night is a citizen of New Jersey.  During the class period Plaintiff purchased pre-filled Blue Rhino Propane Tanks from one or more

retailers within New Jersey. For each purchase, she understood that she was paying for a full tank and was deceived when she received less than a full tank. Plaintiff Suzanna De Night was damaged by Blue Rhino's illegal conduct described herein.

23.     Plaintiff Bart Fraenkel is a citizen of New Jersey. During the class period Plaintiff purchased pre-filled Blue Rhino Propane Tanks from one or more retailers within New Jersey. For each purchase, he understood that he was paying for a full tank and was deceived when he received less than a full tank. Plaintiff Bart Fraenkel was damaged by Blue Rhino's illegal conduct described herein.

24.     Plaintiff Ed Jaeggi is a citizen of New York. During the class period Plaintiff purchased pre-filled Blue Rhino Propane Tanks from one or more retailers within New York. For each purchase, he understood that he was paying for a full tank and was deceived when he received less than a full tank. Plaintiff Ed Jaeggi was damaged by Blue Rhino's illegal conduct described herein.

25.     Plaintiff Gina Penissi is a citizen of North Carolina. During the class period Plaintiff purchased pre-filled Blue Rhino Propane Tanks from one or more retailers within North Carolina. For each purchase, she understood that she was paying for a full tank and was deceived when she received less than a full tank. Plaintiff Gina Penissi was damaged by Blue Rhino's illegal conduct described herein.

26.     Plaintiff Jeff Walker is a citizen of Tennessee. During the class period Plaintiff purchased pre-filled Blue Rhino Propane Tanks from one or more retailers within Tennessee. For each purchase, he understood that he was paying for a full tank and was deceived when he received less than a full tank. Plaintiff Jeff Walker was

7

damaged by Blue Rhino's illegal conduct described herein.

27.     Plaintiffs Victoria and Mark Shawl are citizens of West Virginia.  During the class period Plaintiffs purchased pre-filled Blue Rhino Propane Tanks from one or more retailers within West Virginia.  For each purchase, they understood that they were paying for a full tank and were deceived when they received less than a full tank.  Plaintiffs Victoria and Mark Shawl were damaged by Blue Rhino's illegal conduct described herein.

28.     Plaintiff Randy Shillingburg is a citizen of West Virginia.  During the class period Plaintiff purchased pre-filled Blue Rhino Propane Tanks from one or more retailers within West Virginia.  For each purchase, he understood that he was paying for a full tank and was deceived when he received less than a full tank.  Plaintiff Randy Shillingburg was damaged by Blue Rhino's illegal conduct described herein.

29.     Plaintiff Daniel Bradley is a citizen of Wisconsin.  During the class period Plaintiff purchased pre-filled Blue Rhino Propane Tanks from one or more retailers within Wisconsin.  For each purchase, he understood that he was paying for a full tank and was deceived when he received less than a full tank.  Plaintiff Daniel Bradley was damaged by Blue Rhino's illegal conduct described herein.

30.     Defendant Ferrellgas Partners, L.P. is a Delaware limited partnership with its principal place of business in Overland Park, Kansas, and is publicly-traded on the NYSE under the ticker symbol FGP.  Ferrellgas Partners, L.P. maintains nearly a complete interest in and conducts its business activities primarily through Defendant Ferrellgas, L.P., a Delaware limited partnership also with its principal place of business

in Overland Park, Kansas.

31.     Defendant Ferrellgas, Inc., a Delaware corporation with its principal place of business in Overland Park, Kansas, performs all managerial functions for Ferrellgas Partners, L.P., maintaining an interest in both Ferrellgas Partners, L.P. and Ferrellgas, L.P.  The company does business with Plaintiffs and the members of the Class through the trademarked name "Blue Rhino."  According to its website, the company is the "premier propane provider in the United States, including the largest provider of propane by branded propane tank exchange through its Blue Rhino brand.  It serves approximately 1 million Customers in all 50 states, the District of Columbia, and Puerto Rico." According to Blue Rhino's website, Blue Rhino Propane Tanks are "available at tens of thousands of convenient locations nationwide."

32.     AmeriGas Partners, L.P., a non-party to this Complaint, is a Delaware limited partnership with its principal place of business in King of Prussia, Pennsylvania. Its general partner is non-party AmeriGas Propane, Inc., a Delaware corporation.  Non-party AmeriGas Propane, L.P. is a Delaware limited partnership with its principal place of business in King of Prussia, Pennsylvania, and is the principal operating subsidiary of AmeriGas Partners, L.P.  Together, these entities are referred to herein as "AmeriGas."

33.     Various individuals, partnerships, corporations and associations not named as defendants in this Complaint have participated as co-conspirators in the violations of law alleged herein and have performed acts and made statements and/or material omissions in furtherance thereof.  The identity of all co-conspirators is unknown at this time and will require discovery.

## General Allegations

### *Nature of Trade and Commerce*

34.     Propane Tanks are required by applicable regulations to be fitted with an Overfill Prevention Device (referred to in the industry as an "OPD"), and are typically filled with automated filling equipment.  According to AmeriGas, (i) beginning in about 2000, Propane Tanks were typically filled with approximately 17 pounds of propane; and (ii) before then, Propane Tanks were typically filled with up to 20 pounds of propane.

35.     Blue Rhino sells Propane Tanks through a variety of retail partners nationwide, including convenience and merchandise stores.  A large percentage of its sales to customers are through two large retailers, Wal-Mart and Lowe's.

36.     Physically located on a retailer's property, Propane Tanks are stored in locked display cages that securely hold the tanks and which by their construction partially conceal the tanks.  The retailer typically holds a key to unlock the display cage and handles the payment for the Propane Tank exchange.

37.     To exchange an empty Propane Tank for a filled tank, Blue Rhino's customers typically follow three steps:

        a.      First, the customer arrives at the exchange location, placing his or her empty tank outside the display cage.

        b.      Next, the customer walks inside the retailer's store, paying the retailer one price for a tank exchange or a greater price for a tank with no exchange.  The retailer's cashier typically calls for another employee to walk outside the store and unlock Blue Rhino's display cage.

c.      Finally, the customer returns to the display cage with an employee of the retailer.  The employee unlocks the cage, places the customer's empty tank with other empty tanks, and gives the customer a Propane Tank that is purportedly full.  If a customer is purchasing a propane tank without a related exchange of an empty tank, the employee simply provides the customer with a new, purportedly full tank and does not swap out the customer's empty tank.  Empty tanks are then refurbished if necessary, and washed and refilled (known as "wash and fill" in the industry) and returned to the display cage for the next sale cycle.

38.     During the class period and at all relevant times, Blue Rhino has sold and distributed Propane Tanks in a continuous and uninterrupted flow of interstate commerce, which has affected and continues to affect trade and commerce throughout the United States, including but not limited to in the States identified in Count II herein.

*Relevant Market*

39.     The relevant geographic market for purposes of Count I herein is the United States of America.

40.     The relevant product market for purposes of Count I herein is retail sales and/or exchanges of Propane Tanks.

41.     The relevant geographic market for purposes of Count II herein is each State identified in Count II herein.

42.     The relevant product market for purposes of Count II herein is retail sales and/or exchanges of Propane Tanks in each State identified in Count II herein.

***Market Power***

43.     By virtue of its power to control prices and exclude competition in the relevant market(s), Blue Rhino, alone and/or in combination with AmeriGas, at all relevant times possessed market power in the relevant market(s).  Moreover, at all relevant times Blue Rhino possessed dominant shares of the market(s) for retail sales of Propane Tanks.

44.     On information and belief, Blue Rhino and AmeriGas together control at least 75% of the Propane Tank market and thereby have a sufficient share of the market, both nationwide and in each of the States of identified in Count II herein, to successfully fix, maintain, raise, control, or stabilize the price of Propane Tanks.

45.     Blue Rhino and AmeriGas exchanged competitively sensitive information that had the purpose, tendency and capacity to facilitate price coordination among competitors.

46.     There is substantial concentration among the firms that fill and sell the products in the relevant market(s).

***Overview of the Propane Tank Market***

47.     The Propane Tank exchange business is a relatively new industry.  In 1994, Blue Rhino became the first company to begin nationally selling Propane Tanks through a tank exchange by placing its tank cages at retail establishments.  In the late 1990s, AmeriGas entered the market.  In 2004, Ferrellgas acquired Blue Rhino.

48.     Blue Rhino and AmeriGas are the two largest sellers of Propane Tanks in the United States.  On information and belief, Blue Rhino and AmeriGas together

account for approximately 27 million of the approximately 30 to 35 million annual Propane Tank retail transactions. In other words, Blue Rhino and AmeriGas share approximately 75 to 90 percent of the Propane Tank market.

49. On information and belief, a small number of large retailers account for the vast majority of Blue Rhino's and AmeriGas's sales of Propane Tanks. Lowe's, Home Depot, and Wal-Mart are the three largest of these retailers and account for approximately 61% of all Propane Tank sales. Blue Rhino is the exclusive provider of Propane Tanks sold at Lowe's, and controls approximately two-thirds of the Propane Tanks sold at Wal-Mart. AmeriGas is the near-exclusive provider of Propane Tanks sold at Home Depot, and controls approximately one-third of the Propane Tanks sold at Wal-Mart.

### Blue Rhino's Anticompetitive Agreement to Under-Fill Propane Tanks

50. Over approximately the last five years, Blue Rhino and AmeriGas agreed to wash and fill many of each other's Propane Tanks. For example, for a particular geographic area, AmeriGas may wash, refurbish, label, and/or fill tanks for Blue Rhino at a particular AmeriGas facility. Blue Rhino then retrieves and delivers those Propane Tanks that AmeriGas has filled for delivery to Blue Rhino's customers.

51. On information and belief, executives for Blue Rhino and AmeriGas first met to discuss this arrangement in Summer 2005. As a result of that meeting, in April 2006 the two companies entered into a contract under which Blue Rhino washes and fills Propane Tanks for AmeriGas in Florida. During 2007 and 2008, Blue Rhino and AmeriGas entered into additional contracts to wash and fill or refurbish each other's

tanks at other locations across the United States.

52.    On information and belief, the two companies currently wash, fill, and label approximately 2 million Propane Tanks for each other annually.  Blue Rhino and AmeriGas regularly communicate to coordinate and carry out the arrangement.  For example, Blue Rhino and AmeriGas exchange forecasts about capacity needs to ensure that enough Propane Tanks are available to meet demand at a particular location.

53.    In 2007 prices for propane began to increase along with other commodities that affected the Propane Tank business, such as steel (used to make the tanks) and diesel fuel (used to transport the tanks).  Blue Rhino and AmeriGas became concerned with their ability to pass through the propane price increase to customers.

54.    In or around March 2008, AmeriGas considered but rejected reducing the fill in Propane Tanks to just 16 pounds.

55.    Subsequently however, Blue Rhino and AmeriGas entered into an agreement or understanding to under-fill Propane Tanks with only 15 pounds of propane, without lowering their prices for the under-filled Propane Tanks.

56.    On or about May 23, 2008, Jay Werner, Blue Rhino's Vice President of Operations met in Texas with AmeriGas's Vice President responsible for cylinder exchange for the ostensible purpose of evaluating further opportunities to refurbish, wash and fill each other's tanks ("the May 23, 2008, meeting").  The Blue Rhino and AmeriGas executives toured each other's plants in Texas and exchanged information related to the fixed costs of their respective plants.

57.    Near the conclusion of the May 23, 2008, meeting, Jay Werner of Blue

Rhino raised with the AmeriGas executive the idea of reducing the propane sold in Blue Rhino Propane Tanks from 17 pounds to 15 pounds.

58.     During the May 23, 2008, meeting, the two executives also discussed Jay Werner's communications with Kosan Crisplant ("Kosan"), a distributor and operator of propane filling equipment that could build and operate facilities to wash and fill Propane Tanks.  Jay Werner of Blue Rhino told Kosan that if Kosan built a plant in the Northeast United States, Kosan could process Propane Tanks for Blue Rhino and AmeriGas, but would not be permitted by Blue Rhino and AmeriGas to process Propane Tanks for Heritage Propane, a small but aggressive competitor of Blue Rhino and AmeriGas.

59.     After the May 23, 2008, meeting, AmeriGas executives internally discussed reducing the fill for both AmeriGas and Blue Rhino Propane Tanks from 17 to 15 pounds, and evaluated the operational changes that would be required to reduce the propane in Propane Tanks from 17 to 15 pounds.

60.     On or about June 25, 2008, Tod Brown, President of Blue Rhino and Senior Vice President of Sales and Marketing for Ferrellgas, Inc., called AmeriGas's president of sales and marketing to again discuss the change to filling Propane Tanks with only 15 pounds of propane.  Blue Rhino advised that it would switch to 15 pound tanks effective July 21, 2008.

61.     On or about June 26, 2008, Jay Werner of Blue Rhino and an AmeriGas employee discussed the operational changes needed for filling Propane Tanks with only 15 pounds of propane.  The two companies also discussed the timing of the rollout of the under-filled tanks to Blue Rhino's and AmeriGas's customers.

62.     By the last week of June 2008, Blue Rhino and AmeriGas agreed to reduce the fill in their Propane Tanks to 15 pounds of propane.  Blue Rhino would begin selling 15 pound tanks on July 21, 2008, while AmeriGas would begin selling 15 pound tanks on August 1, 2008.

63.     Even prior to Blue Rhino's and AmeriGas's roll-out of the 15 pound Propane Tanks, Blue Rhino and AmeriGas designated 15 pounds as the "new industry standard."   For example, AmeriGas described the change in the cylinder exchange program to AmeriGas employees by memorandum dated July 15, 2008:  "In an attempt to offset some of these expenses, achieve desired product margins, and maintain retail prices at an attractive level for consumers, AmeriGas Cylinder Exchange *and other national providers* are transitioning to a 15 pound cylinder.  This slight decrease from current 17 pound levels *will quickly become the industry standard . . . .*"  (emphasis supplied).

64.     In announcing the change to AmeriGas's production team, AmeriGas reported:  "The cylinders will be filled with 3.5 gallons of propane versus the current 4 gallons. . . .  *The major competitors in cylinder exchange will also be moving to a 15 pound cylinder and as a result, it will become the industry standard*."   (emphasis supplied).  The "other national providers" and "major competitors" in the cylinder exchange industry referred to by AmeriGas include primarily, if not solely, Blue Rhino.

65.     As planned, starting in late July or early August 2008, Defendant Blue Rhino and the other industry giant, AmeriGas, began under-filling their Propane Tanks with only 15 pounds of propane.  The price of a Propane Tank did not decrease.  Therefore, the companies effectively implemented an agreed and coordinated price

increase.

66.     Except for Wal-Mart, the major retailers, including Lowe's and Home Depot, agreed to sell the 15 pound Propane Tanks without lowering prices.  Wal-Mart initially would not agree that Blue Rhino and AmeriGas could provide 15 pound Propane Tanks for exchange or purchase at Wal-Mart.  Both Blue Rhino and AmeriGas worked to convince Wal-Mart to implement the change.  Eventually, around October 2008, Wal-Mart agreed to sell the 15 pound Propane Tanks.

67.     On information and belief, the Oklahoma LP Gas Board refused to allow sale of these under-filled Propane Tanks in Oklahoma.  Representatives from both Blue Rhino and AmeriGas worked in concert to convince the Oklahoma LP Gas board to permit sale of Propane Tanks filled with only 15 pounds of propane in the State of Oklahoma.

68.     Blue Rhino and AmeriGas are members of trade associations, and have ample opportunities to meet and conspire at meetings of those associations.  For example, the 2007-2008 National Propane Gas Association ("NPGA") Annual Report shows representatives of Blue Rhino on the Executive Committee as Directors at Large.  Likewise, both AmeriGas and Blue Rhino are listed as members of the World LP Gas Association ("WLPGA").  Both the NPGA and WLPGA hold regular meetings and conventions, which are convenient forums for Blue Rhino to collude on anticompetitive conduct.

69.     On information and belief, the agreement to reduce the fill of Propane Tanks to 15 pounds was discussed and/or agreed to, with and pursuant to the cooperation

of Blue Rhino, at one or more industry meetings, including but not limited to at meetings of the NPGA's Cylinder Exchange Counsel.

***Blue Rhino Misleads Consumers***

70.     In reducing the amount of propane in a Propane Tank, Blue Rhino did not similarly reduce the size of the Propane Tank or otherwise plainly or adequately disclose to Plaintiffs and members of the Class that the Propane Tanks were not full.  To the contrary, the Blue Rhino Propane Tanks bore a cap that expressly said "full," as did other Blue Rhino marketing and point of sale materials.  Blue Rhino's displays and other materials did not disclose that customers were receiving anything less than a full tank. And, when Blue Rhino reduced the Propane Tanks from 17 pounds to 15 pounds, it did not disclose, or at a minimum failed to adequately disclose, that the Propane Tanks contained only 15 pounds of propane, or that there had been a reduction in the amount of propane contained in its Propane Tanks.

71.     Unlike many other products, a visual inspection of a Propane Tank will not readily reveal the level to which the tank is filled.  For instance, even though the Propane Tanks were filled with approximately 17 pounds of propane for most of this decade, the Propane Tanks are commonly referred to as 20 pound tanks.  Moreover, many Propane Tanks are specifically stamped with a marking indicating they are 20 pound tanks. Adding to the appearance and impression is the fact that, at least prior to 2000, Blue Rhino typically filled its Propane Tanks with up to 20 pounds of propane.  In the end, Blue Rhino deceives consumers by representing that the Propane Tanks are full when they are not.

72.     Historically, Blue Rhino Propane Tanks contained a FuelCheck sleeve that allowed consumers to gauge the fill level of their Propane Tanks.  On information and belief, Blue Rhino removed this gauge and thereby prevented retail purchasers from learning that their Blue Rhino Propane Tanks were under-filled.

73.     On information and belief, at all relevant times, Blue Rhino retained the responsibility and control for advertising the Propane Tanks and for providing retailers with a variety of point-of-sale marketing materials.  During the class period, Blue Rhino advertised that customers were receiving full tanks, when they were not.  For example, on Blue Rhino's cylinder display cages, Blue Rhino offers "A Better Way" for exchanging an empty propane tank for a full tank from the "#1 BRAND IN TANK EXCHANGE." And, Blue Rhino notes to customers that they can exchange, replace or buy another tank, stating or implying that the tanks Plaintiffs and Class members were purchasing were not only filled to capacity, but were at least as full as what they had previously purchased: "Exchange Empty for Full," "Upgrade Your Obsolete Cylinder," "Get a Full Tank," and "Don't Run Out – Buy a Spare."  Moreover, Blue Rhino Propane Tanks bore caps stating that the tanks were "FULL."

74.     Blue Rhino's unlawful practices directly damaged Plaintiffs and Class Members.  Because Blue Rhino short-filled the Propane Tanks, Plaintiffs and Class members paid a higher price per pound for the propane they actually received. Additionally, because Plaintiffs and Class members received less propane, they will be required to exchange their Propane Tanks more often than they would have had Blue Rhino not short-filled the Propane Tanks.  Either way, Blue Rhino unjustly profits at the

expense of Plaintiffs and the class because Blue Rhino can fill more Propane Tanks for less cost and because Plaintiffs and Class members will be required to exchange Propane Tanks more frequently.

75.     Plaintiff and the Class reasonably expected that the Propane Tanks they purchased would be full.

76.     Plaintiffs and the Class did not know they were purchasing under-filled Propane Tanks and had no reasonable way of learning this fact.  Purchasers of Blue Rhino Propane Tanks were harmed by Blue Rhino's actions in that they paid an under-filled Propane Tank.

## Class Action Allegations

77.     Plaintiffs bring Counts I, III, and IV of this action under Federal Rule of Civil Procedure 23 on behalf of themselves and a Nationwide Class defined as:  All persons who purchased a Propane Tank sold, marketed, or distributed by any Defendant during the applicable limitations periods.  Excluded from the Nationwide Class are Blue Rhino's officers, directors, and employees, and any Judge to whom this case is or may be assigned, his or her court staff, as well as his or her immediate family.

78.     The Nationwide Class is comprised of thousands of individuals who are geographically dispersed across the country, and thus joinder is impracticable.  Class members can be identified from, among other things, credit card records of the sale of Propane Tanks at the retail outlets where they are sold.

79.     Plaintiffs bring, as applicable to each of the various States, Count II, and Counts III and IV (alternatively to the Nationwide Class claims of those Counts) under

Federal Rule of Civil Procedure 23 on behalf of themselves and State Sub-Classes defined as: All persons who purchased in the applicable State a Propane Tank sold, marketed or distributed by any Defendant during the applicable limitations periods. Excluded from each State Sub-Class are Blue Rhino's officers, directors, and employees, and any Judge to whom this case is or may be assigned, his or her court staff, as well as his or her immediate family.

80. Each State Sub-Class is comprised of hundreds or thousands of individuals who are geographically dispersed across the applicable State, and thus joinder is impracticable. State Sub-Class members can be identified from, among other things, credit card records of the sale of Propane Tanks at the retail outlets where they are sold.[2]

81. Plaintiffs' claims present common questions of law and fact that predominate over the questions affecting only individual Class members, including:

a. Whether and when Blue Rhino began under-filling Propane Tanks sold to customers;

b. Whether Blue Rhino misrepresented or failed to disclose to Plaintiff and the Class that its Propane Tanks were under-filled;

c. Whether the misrepresented and undisclosed facts were material to Plaintiff and the Class;

d. Whether Blue Rhino was unjustly enriched;

e. Whether Blue Rhino engaged in a contract, combination, agreement, arrangement, and/or conspiracy to fix, maintain, control, or stabilize the prices of Propane Tanks by selling under-filled tanks;

f. Whether Blue Rhino actively implemented and actively concealed the contract, combination, or conspiracy;

---

[2] Plaintiffs reserve their right to amend and/or refine the class and subclass definitions as appropriate during the class certification phase of this action.

g. The operative time period of the alleged conspiracy;

h. Whether Blue Rhino's conduct caused an increase in the effective price of propane sold in Propane Tanks;

i. Whether Blue Rhino's conduct caused injury to the business or property of Plaintiffs and class members;

j. Whether Blue Rhino's conduct violated federal and, as applicable, state antitrust statutes;

k. Whether Blue Rhino's conduct violated the state consumer protection statute(s) pleaded in this complaint, including but not limited to by virtue of having violated so-called "slack fill" laws;

l. Whether Plaintiffs and the Class are entitled to recover damages, whether actual, statutory or punitive, restitution, and/or equitable relief from Blue Rhino based on the conduct alleged herein.

82. Each Plaintiff's claims are typical of the claims of the Nationwide Class, and any applicable State Sub-Class, because they arise out of the same conduct by Blue Rhino.

83. Each Plaintiff will fairly and adequately protect the interests of the Nationwide Class, and any applicable State Sub-Class, and has no conflicts with other members of the classes in pursuing these claims.  Further, Plaintiffs have retained counsel who are experienced in class litigation of this type and agree to diligently prosecute this case.

84. Blue Rhino's conduct alleged as wrongful herein applies generally to all Plaintiffs and Class members, and thus final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

85. A class action is superior to other available means for the fair and efficient adjudication of the claims of the plaintiffs and class members because the amount at issue

for each purchaser is relatively small compared to the expense of individualized litigation and it would thus be inefficient and practically improbable to do so.

86. Class-wide litigation of this case is manageable and promotes judicial economy compared to thousands of individual cases.

**Tolling of the State of Limitations, Fraudulent Concealment, and Equitable Tolling**

87. Plaintiffs did not discover and could not have discovered through the exercise of reasonable diligence the existence of the claims sued upon herein until immediately prior to commencing the civil actions that comprise this Multi-District Litigation.

88. Any applicable statutes of limitation have been tolled by Defendants' affirmative acts of fraudulent concealment and continuing misrepresentations.

89. Because of the self-concealing nature of Defendants' actions and their affirmative acts of concealment, Plaintiffs and the Class or Subclasses assert the tolling of any applicable statutes of limitations affecting the claims raised herein.

90. Defendants continued to engage in the deceptive practice, and consequently, unwary consumers were injured on a daily basis by Defendants' unlawful conduct. Therefore, Plaintiffs and the Class or Subclasses submit that each instance that Defendants engaged in the conduct complained of herein and each instance that a Class member purchased or exchanged a Propane Gas Tank constitutes part of a continuing violation and operates to toll the statutes of limitation in this action.

91. Defendants are estopped from relying on any statute of limitations defense because of their unfair or deceptive conduct.

92.     Defendants' conduct was and is, by its nature, self concealing.  Still, Defendants, through a series of affirmative acts or omissions, suppressed the dissemination of truthful information regarding their illegal conduct, and have actively foreclosed Plaintiffs and Class members from learning of their illegal, anticompetitive, unfair and/or deceptive acts.

93.     By reason of the foregoing, the claims of Plaintiffs and Class members are timely under any applicable statute of limitations, pursuant to the discovery rule, the equitable tolling doctrine, and fraudulent concealment.

## Count I:

## Declaratory and Injunctive Relief for Violation of Section 1 of the Sherman Act

94.     Plaintiffs repeat and reallege the preceding and subsequent paragraphs as though set forth herein.

95.     Beginning in 2008 and continuing through the filing of this Complaint, Blue Rhino and its co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, maintain, and stabilize prices for Propane Tanks in the United States, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

96.     In formulating and carrying out the alleged agreement, understanding, or conspiracy to under-fill Propane Tanks, Blue Rhino and its co-conspirators effectively fixed, raised, maintained, and stabilized the price of Propane Tanks.

97.     The combination and conspiracy alleged herein has had the following effects, among others:

a.     Price competition in the sale of Propane Tanks has been restrained or suppressed in the United States;

b.     Prices for Propane Tanks sold by Blue Rhino and its co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

c.     Those who purchased Propane Tanks, directly or indirectly, from Blue Rhino and its co-conspirators have been deprived of the benefits of free and open competition.

d.     Plaintiffs and Class members paid supra-competitive, artificially inflated prices for Propane Tanks.

98.     Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business or property by Blue Rhino's antitrust violations. Their injury consists of receiving less propane in a Propane Tank and thus effectively paying higher prices for their Propane Tank purchases than they would have paid in the absence of those violations.

99.     Plaintiffs and the Class, pursuant to Rule 57 of the Federal Rules of Civil Procedure and 18 U.S.C. § 2201(a), hereby seek a declaratory judgment that Blue Rhino's conduct as described herein violates Section 1 of the Sherman Act.

100.    Plaintiffs and the Nationwide Class are entitled to an injunction against Blue Rhino, preventing and restraining the violations alleged herein.

## Count II:

### Violation of State Antitrust Acts

101.    Plaintiffs repeat and reallege the preceding and subsequent paragraphs as though set forth herein.

102.    The combination and conspiracy alleged herein has had the following effects, among others:

      a.    Price competition in the sale of Propane Tanks has been restrained or suppressed throughout each State set forth below;

      b.    Prices for Propane Tanks sold by Blue Rhino and its co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout each State set forth below;

      c.    Those who purchased Propane Tanks in each State set forth below, directly or indirectly, from Blue Rhino and its co-conspirators have been deprived of the benefits of free and open competition.

      d.    Members of each State Sub-Class set forth below paid supra-competitive, artificially inflated prices for Propane Tanks.

103.    During the class period, Blue Rhino's illegal conduct substantially affected commerce in each State set forth below.

104.    As a direct and proximate result of Blue Rhino's unlawful conduct, the members of each of the following State Sub-Classes have been injured in their business and property and are threatened with further injury.

105.    By reason of the foregoing, Blue Rhino entered into agreements in restraint

of trade in violation of the laws of each State set forth below.

106. **Arizona:** The aforementioned conduct by Blue Rhino was and is in violation of the Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. §§ 44-1401 *et seq*.

107. **California:** The aforementioned conduct by Blue Rhino was and is in violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq*.

108. **District of Columbia:** The aforementioned conduct by Blue Rhino was and is in violation of the District of Columbia Antitrust Act, D.C. Code §§ 28-4501 *et seq*.

109. **Florida:** The aforementioned conduct by Blue Rhino was and is in violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq*.

110. **Iowa:** The aforementioned conduct by Blue Rhino was and is in violation of the Iowa Competition Law, Iowa Code §§ 553.1 *et seq*.

111. **Kansas:** The aforementioned conduct by Blue Rhino was and is in violation of the Kansas Monopolies and Unfair Trade Act, K.S.A. §§ 50-101 *et seq*.

112. **Maine:** The aforementioned conduct by Blue Rhino was and is in violation of the Maine Monopolies and Profiteering Statute, Maine Rev. Stat. Ann. tit. 10 §§ 1101 *et seq*.

113. **Michigan:** The aforementioned conduct by Blue Rhino was and is in violation of Michigan Comp. Law Ann. §§ 445.771 *et seq*.

114. **Minnesota:** The aforementioned conduct by Blue Rhino was and is in violation of the Minnesota Antitrust Law, Minnesota Stat. §§ 325D.49 *et seq*.

27

115.  **Mississippi:**  The aforementioned conduct by Blue Rhino was and is in violation of Mississippi Code Ann. §§ 75-21-1 *et seq.*

116.  **Nebraska:**  The aforementioned conduct by Blue Rhino was and is in violation of the Junkin Act, Neb. Rev. Stat. §§ 59-801 *et seq.*

117.  **Nevada:**  The aforementioned conduct by Blue Rhino was and is in violation of the Nevada Unfair Trade Practices Act, Nevada Rev. Stat. Ann. §§ 598A.010 *et seq.*

118.  **New Mexico:**  The aforementioned conduct by Blue Rhino was and is in violation of New Mexico Stat. Ann. §§ 57-1-1 *et seq.*

119.  **New York:**  The aforementioned conduct by Blue Rhino was and is in violation of the Donnelly Act, N.Y. Gen. Bus. Law §§ 340 *et seq.*  The New York Sub-Class does not seek treble damages in this action.

120.  **North Carolina:**  The aforementioned conduct by Blue Rhino was and is in violation of North Carolina Gen. Stat. §§ 75-1 *et seq.*

121.  **North Dakota:**  The aforementioned conduct by Blue Rhino was and is in violation of the North Dakota Antitrust Act, N.D. Cent. Code §§ 51-08.1-01 *et seq.*

122.  **South Dakota:**  The aforementioned conduct by Blue Rhino was and is in violation of South Dakota Codified Laws Ann. §§ 37-1-3.1 *et seq.*

123.  **Tennessee:**  The aforementioned conduct by Blue Rhino was and is in violation of Tennessee Code Ann. §§ 47-25-101 *et seq.*

124.  **Utah:**  The aforementioned conduct by Blue Rhino was and is in violation of the Utah Antitrust Act, Utah Code Ann. §§ 76-10-911 *et seq.*

125. **Vermont:** The aforementioned conduct by Blue Rhino was and is in violation of Vermont Stat. Ann. tit. 9 §§ 2451 *et seq.*

126. **West Virginia:** The aforementioned conduct by Blue Rhino was and is in violation of West Virginia Stat. §§ 47-18-1 *et seq.*

127. **Wisconsin:** The aforementioned conduct by Blue Rhino was and is in violation of Wisconsin Stat. §§ 133.01 *et seq.*

## Count III:

### Violation of State Consumer Protection Laws

128. Plaintiffs repeat and reallege the preceding and subsequent paragraphs as though set forth herein.

### *Blue Rhino's Conduct Violates the Kansas Consumer Protection Act, and Other States' Consumer Protection Statutes*

129. Plaintiffs and Class members are consumers who bought Propane Tanks primarily for personal, family, or household purposes. The Propane Tanks are "goods" or "merchandise," and Plaintiffs' purchases of the Propane Tanks constitute "transactions." Blue Rhino's sale of Propane Tanks through retail partners occurs in the regular course of Blue Rhino's business.

130. Blue Rhino, in connection with the sale of its Propane Tanks, engaged in deceptive, unconscionable, unfair, fraudulent, and misleading commercial practices. Blue Rhino represented that its goods or merchandise had characteristics, uses, benefits, or quantities that it did not have, and that its goods or merchandise was of a particular standard, quality, or grade that it was not.

131. Blue Rhino concealed, suppressed, or omitted material facts with the intent that Plaintiffs and Class members rely upon such concealment, suppression, or omissions. Blue Rhino's conduct was objectively deceptive and had the capacity to deceive reasonable consumers under the circumstances. The fact that Blue Rhino under-filled Propane Tanks, and that such tanks were not full when purchased was a material fact that a reasonable and/or unsophisticated consumer would attach importance to at the time of purchase, and would have influenced consumers' decisions on whether to purchase and how much to pay for Propane Tanks.

132. Through its false and misleading advertising, including but not limited to statements made on propane exchange cages and the Propane Tanks themselves, Blue Rhino engaged in the willful use, in written representations, of exaggeration, falsehood, innuendo and ambiguity as to a material facts in connection with consumer transactions.

133. Further, on information and belief, Blue Rhino agreed to, and did in fact, act in restraint of trade or commerce by fixing, controlling, stabilizing, and/or maintaining at non-competitive levels the price of propane contained in Propane Tanks, and made efforts to conceal their agreements from Plaintiffs and Class members.

134. Blue Rhino's course of conduct had an impact on the public interest because the acts were part of a generalized course of conduct affecting numerous customers.

135. Blue Rhino's conduct, which included deception, fraud, false pretenses, misrepresentations, and the knowing concealment, suppression, or omission of material facts caused and resulted in injury in fact and ascertainable loss of money or property to

Plaintiffs and Class members. The resulting injury to Plaintiffs and Class members was foreseeable by Blue Rhino.

136. Plaintiffs, on behalf of themselves and Class members, seek to recover the damages they suffered, including actual and punitive damages, restitution of all monies wrongfully acquired by Blue Rhino as a result of their misconduct, injunctive and declaratory relief, attorneys' fees and costs, and other non-monetary relief as appropriate.

137. The conduct alleged herein violates the Kansas Consumer Protection Act, K.S.A. §§ 50-623 *et seq.*, which should apply to the claims of the Nationwide Class.

138. Defendants' headquarters and principal place of business are located in Overland Park, Kansas. Defendants also own property and conduct substantial business in Kansas. On information and belief, Blue Rhino's decision to under-fill Propane Gas Tanks emanated from its Kansas headquarters. Further, on information and belief, Blue Rhino's misleading marketing efforts for under-filled Propane Tanks were orchestrated from its headquarters in Kansas. This conduct similarly injured and affected all Class members residing in the United States, and a significant number of Class members in Kansas.

139. Alternatively, the conduct alleged herein violates the consumer protection statutes of each of the following jurisdictions, which the Court may apply with respect to the corresponding State Sub-Classes.

140. **Arizona:** The aforementioned practices by Blue Rhino were and are in violation of Arizona's Consumer Protection Act, Ariz. Rev. Stat. §§ 44-1521 *et seq.*

141. **Arkansas:** The aforementioned practices by Blue Rhino were and are in

violation of Ark. Code §§ 4-88-101 *et seq.*

142. **California:**  The aforementioned practices by Blue Rhino were and are in violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*, and California's Consumers Legal Remedies Act (CLRA), Cal. Civ. Code. §§ 1750 *et seq.*[3]

143. **Colorado:**  The aforementioned practices by Blue Rhino were and are in violation of Colo. Rev. Stat. §§ 6-1-105 *et seq.*

144. **Connecticut:**  The aforementioned practices by Blue Rhino were and are in violation of Conn. Gen. Stat. §§ 42-110b *et seq.*

145. **Delaware:**  The aforementioned practices by Blue Rhino were and are in violation of 6 Del. Code §§ 2511 *et seq.*

146. **District of Columbia:**  The aforementioned practices by Blue Rhino were and are in violation of District of Columbia Code §§ 28-3901 *et seq.*

147. **Florida:**  The aforementioned practices by Blue Rhino were and are in violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq.*

148. **Hawaii:**  The aforementioned practices by Blue Rhino were and are in violation of Hawaii Rev. Stat. §§ 480 *et seq.*

---

[3] Plaintiffs and the California Sub-Class demand all forms of relief available under the CLRA. To the extent any individual plaintiff has not made a demand under the CLRA, pursuant to California Civil Code § 1780(a), such plaintiff(s) seek an order enjoining Blue Rhino from engaging in the methods, acts, or practices alleged herein.  Pursuant to California Civil Code § 1782, if Blue Rhino does not rectify its illegal acts, such plaintiff(s) will seek leave to amend the Complaint to seek all available relief.

149.  **Idaho:**   The aforementioned practices by Blue Rhino were and are in violation of Idaho Code §§ 48-601 *et seq.*

150.  **Illinois:**   The aforementioned practices by Blue Rhino were and are in violation of 815 ILCS §§ 505/1 *et seq.*

151.  **Kansas:**   The aforementioned practices by Blue Rhino were and are in violation of the Kansas Consumer Protection Act, K.S.A. §§ 50-623 *et seq.*

152.  **Maryland:**   The aforementioned practices by Blue Rhino were and are in violation of Md. Com. Law Code §§ 13-101 *et seq.*

153.  **Massachusetts:**   The aforementioned practices by Blue Rhino were and are in violation of Mass. Gen. Laws Ch. 93A, §§ 1 *et seq.*

154.  **Michigan:**   The aforementioned practices by Blue Rhino were and are in violation of the Michigan Consumer Protection Act, Michigan Comp. Law Ann. §§ 445.901 *et seq.*

155.  **Minnesota:**   The aforementioned practices by Blue Rhino were and are in violation of the Minnesota Consumer Fraud Act, Minn. Stat. §§ 325F.67 *et seq.*

156.  **Missouri:**   The aforementioned practices by Blue Rhino were and are in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. §§ 407.010 *et seq.*

157.  **Nebraska:**   The aforementioned practices by Blue Rhino were and are in violation of the Nebraska  Consumer Protection Act, Neb. Rev. Stat. §§ 59-1601 *et seq.*

158.  **Nevada:**   The aforementioned practices by Blue Rhino were and are in violation of the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. §§ 598.0903 *et seq.*

159.  **New Hampshire:**   The aforementioned practices by Blue Rhino were and

are in violation of N.H. Rev. Stat. §§ 358-A:1 *et seq*.

160. **New Jersey:** The aforementioned practices by Blue Rhino were and are in violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1 *et seq*, and the New Jersey Truth-in-Consumer Contract, Warranty and Notice Act, N.J. Stat. Ann. §§ 56:12-14 *et seq*.

161. **New Mexico:** The aforementioned practices by Blue Rhino were and are in violation of New Mexico Stat. §§ 57-12-1 *et seq*.

162. **New York:** The aforementioned practices by Blue Rhino were and are in violation of New York's General Business Law, N.Y. Gen. Bus. Law §§ 349 *et seq*. Without prejudice to the allegation herein that Blue Rhino's conduct was willful and knowing, the New York Sub-Class does not seek treble damages in this action.

163. **North Carolina:** The aforementioned practices by Blue Rhino were and are in violation of North Carolina Gen. Stat. §§ 75-1.1 *et seq*.

164. **North Dakota:** The aforementioned practices by Blue Rhino were and are in violation of the North Dakota Consumer Fraud Act, N.D. Cent. Code §§ 51-15-01 *et seq*.

165. **Ohio:** The aforementioned practices by Blue Rhino were and are in violation of Ohio Rev. Stat. §§ 1345.01 *et seq*.

166. **Oklahoma:** The aforementioned practices by Blue Rhino were and are in violation of Okla. Stat. tit. 15 §§ 751 *et seq*.

167. **Oregon:** The aforementioned practices by Blue Rhino were and are in violation of Or. Rev. Stat. §§ 646.605 *et seq*.

168. **Pennsylvania:** The aforementioned practices by Blue Rhino were and are in violation of 73 Pa. Stat. §§ 201-1 *et seq.*

169. **Rhode Island:** The aforementioned practices by Blue Rhino were and are in violation of Rhode Island Gen. Laws §§ 6-13.1-1 *et seq.*

170. **South Carolina:** The aforementioned practices by Blue Rhino were and are in violation of S.C. Code Laws §§ 39-5-10 *et seq.*

171. **South Dakota:** The aforementioned practices by Blue Rhino were and are in violation of S.D. Codified Laws §§ 37-24-1 *et seq.*

172. **Utah:** The aforementioned practices by Blue Rhino were and are in violation of Utah Code Ann. §§ 13-11-1 *et seq.*

173. **Vermont:** The aforementioned practices by Blue Rhino were and are in violation of Vt. Stat. Ann. tit. 9 §§ 2451 *et seq.*

174. **Washington:** The aforementioned practices by Blue Rhino were and are in violation of Washington's Consumer Protection Act, Wash. Rev. Code §§ 19.86.010 *et seq.*

175. **West Virginia:** The aforementioned practices by Blue Rhino were and are in violation of W. Va. Code §§ 46A-6-101 *et seq.*

176. **Wisconsin:** The aforementioned practices by Blue Rhino were and are in violation of the Wisconsin Unfair Trade Practices Act, Wis. Stat. §§ 100.18 *et seq.*

## Count IV:

### Unjust Enrichment

177. Plaintiffs repeat and reallege the preceding and subsequent paragraphs as

though set forth herein.

178. Blue Rhino has been, and continues to be, unjustly enriched as a result of its wrongful conduct to the detriment of Plaintiffs and the Nationwide Class.

179. Plaintiff and the Nationwide Class are entitled to disgorgement and restitution of all wrongfully-obtained gains received by Blue Rhino as a result of its wrongful conduct.

180. As previously alleged, Kansas substantive law applies to the unjust enrichment claims of the entire Nationwide Class.

181. In the alternative, Plaintiffs and the Sub-Class from each and every of the various States, pursuant to each State's substantive law, seek disgorgement and restitution of all wrongfully-obtained gains received by Defendants as a result of their wrongful conduct.

### Prayer for Relief

WHEREFORE, Plaintiffs, on behalf of themselves and the Nationwide Class, and as applicable and/or alternatively the State Sub-Classes, request that the Court enter an order or judgment against Blue Rhino including the following:

A. Certifying the proposed Nationwide Class and/or State Sub-Classes under Rule 23 of the Federal Rules of Civil Procedure, and appointing Plaintiffs as Class Representatives and undersigned counsel as Class Counsel;

B. Declaring that Blue Rhino's conduct violates section 1 of the Sherman Act;

C. Enjoining Blue Rhino's continued violation of section 1 of the Sherman Act;

D.      Determining that Blue Rhino's conduct violates the State Antitrust Statutes as alleged herein;

E.      Determining that Blue Rhino's conduct violates the State Consumer Protection Statutes alleged herein;

F.      Determining that Blue Rhino was unjustly enriched;

G.      Awarding damages in an amount to be determined at trial, including all actual, statutory, and punitive damages, except (1) as provided herein, and (2) that the New York Sub-Class does not seek statutory treble damages under New York law;

H.      Awarding pre- and post-judgment interest;

I.      Awarding equitable relief in the form of disgorgement or restitution;

J.      Ordering injunctive relief as pleaded or as the Court may deem proper;

K.      Awarding Plaintiffs their reasonable attorneys fees, costs, and expenses; and

L.      Awarding such other relief as the Court deems equitable and just.

**Jury Demand**

Plaintiffs, on behalf of themselves and all similarly situated persons, hereby demand a trail by jury on all issues that may be tried to a jury.

Dated February 22, 2009

Respectfully submitted,

STUEVE SIEGEL HANSON LLP

   /s/ Norman E. Siegel
Norman E. Siegel
460 Nichols Road, Suite 200
Kansas City, MO 64112
Tel: (816) 714-7112
Fax: (816) 714-7101

*Liaison Counsel and Member of the Executive Committee*

Elizabeth A. Fegan
HAGENS BERMAN SOBOL SHAPIRO LLP
820 North Blvd., Suite B
Oak Park, IL 60302
Tel: (708) 776-5604
Fax: (708) 776-5601

*Co-Lead Counsel and Member of the Executive Committee*

Eric H. Gibbs
GIRARD GIBBS LLP
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846

*Co-Lead Counsel and Member of the Executive Committee*

Laurence D. King
KAPLAN FOX & KILSHEIMER LLP
350 Sansome Street, Suite 400
San Francisco, California 94104
Tel: (415) 772-4700
Fax: (415) 772-4707

*Co-Lead Counsel and Member of the Executive Committee*

Christopher Burke
Joseph P. Guglielmo
SCOTT+SCOTT LLP
600 B Street, Ste. 1500
San Diego, CA 92101
Tel: (619) 233-4565
Fax:  (619) 233-0508

*Member of the Executive Committee*

Edward M. Gergosian
Robert J. Gralewski, Jr.
GERGOSIAN & GRALEWSKI LLP
655 West Broadway, Suite 1410
San Diego, CA 92101
Tel: (619) 237-9500

*Member of the Executive Committee*

Michael J. Flannery
CAREY & DANIS, LLC
8235 Forsyth Blvd., Suite 1100
St. Louis, Missouri 63105
Tel: (314) 725-7700
Fax: (314) 721-0905

W. Greg Wright
Charles T. Schimmel
BEAM-WARD, KRUSE, WILSON,
WRIGHT & FLETES, LLC
8695 College Blvd. Suite 200
Overland Park, Kansas 66210
Tel: (866) 420-9419

Daniel. E. Gustafson
Daniel. C. Hedlund
David A. Goodwin
GUSTAFSON GLUEK PLLC
650 Northstar East
608 Second Avenue South
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622

Joseph P. Guglielmo
SCOTT + SCOTT, LLP
500 Fifth Avenue, 40th Floor
New York, NY 10110
Tel: (212) 223-6444
Fax: (212) 223-6334

Thomas V. Bender
WALTERS, BENDER,
STROHBEHN & VAUGHN, P.C.
2500 City Center Square
1100 Main, Suite 2500
Kansas City, MO 64105
Tel: (816) 421-6620

Michael J. Boni
Joanne Zack
Joshua D. Snyder
Theresa Henson
BONI & ZACK LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Tel: (610) 822-0200
Fax: (610) 822-0206

Robert K. Shelquist
LOCKRIDGE GRINDAL NAUEN
P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, Minnesota 55401-2197
Tel: (612) 339-6900
Fax: (612) 339-0981

Michael Dell' Angelo
Merrill G. Davidoff
BERGER MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tel: (800) 424-6690
Fax: (215) 875-4604

Joseph S. Silver
SILVER & AGACINSKI, P.A.
1325 West Cass Street
Tampa, Florida 33606
Tel: (813) 259-9863
Fax: (813) 259-9864

Francis A. Bottini, Jr.
Frank J. Johnson
Derek J. Wilson
JOHNSON & BOTTINI LLP
655 W. Broadway, Suite 1400
San Diego, CA 92101
Tel: (619) 230-0063
Fax: (619) 233-5535

Kathleen C. Chavez
CHAVEZ LAW FIRM, P.C.
3 North Second Street Suite 300
St. Charles, Illinois 60174
Tel: (630) 232-4480
Fax: (630) 845-8982

William C. Wright
THE LAW OFFICES OF
WILLIAM C. WRIGHT, P.A.
319 Clematis St., Suite 109
West Palm Beach, FL 33401
Tel: (561) 514-0904
Fax: (561) 514-0905

Greg L. Davis
GREG L. DAVIS, LLC
6987 Halcyon Park Drive
Montgomery, AL 36117
Tel: (334) 832-9080
Fax: (334) 409-7001

Robert M. Foote, Esq.
Matthew J. Herman, Esq.
FOOTE, MEYERS, MIELKE
& FLOWERS, LLC
3 North Second Street Suite 300
St. Charles, Illinois 60174
Tel: (630) 232-6333
Fax: (630) 845-8982

Peter L. Currie, Esq.
THE LAW FIRM OF
PETER L. CURRIE, P.C.
536 Wing Lane
St. Charles, Illinois 60174
Tel: (630) 862-1130

*Additional Counsel for Plaintiffs*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 22, 2010, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send a notice of electronic filing to all person registered for ECF as of this date.

I further certify that I caused a copy of the foregoing document to be mailed on February 22, 2010 by first class mail, postage paid, to the following non-ECF participant:

Philip R. Glasser
PO Box 26141
Overland Park, KS 66225-6141

  /s/ Norman E. Siegel
Norman E. Siegel